# ATTACHMENT 2

AVONDALE INCORPORATED, et al.,

Plaintiffs,

v.

NORFOLK SOUTHERN INCORPORATED, et al.,

Defendants

SURREBUTTAL REPORT AND DISCLOSURE OF

David B. Lasater, Ph. D., CPA

January 31, 2008

**Confidential**

## I. Experience and Credentials

Descriptions of my experience and qualifications and also my updated resume and Rule 26 disclosure appear in my initial report, and I incorporate them by reference here.

## II. Purpose of the Report

I have been retained by legal counsel for the defendant Norfolk Southern in this matter. I have been asked by those counsel to evaluate and comment on the December 7, 2007 plaintiff expert report submitted by Robert Taylor IV. I understand that the December 7, 2007 Taylor report was proffered to correct identified errors or update calculations in his earlier March 23, 2007 report in this matter. I have read that report, the December 2007 and January 2008 depositions taken from Mr. Altherr and Mr. Taylor about that report, and the documents that Avondale and Mr. Taylor produced as purported reliance for that report.

My understanding is that the plaintiffs in September 2007 argued a "slow death" theory. That theory posits May 26, 2006 as the valuation date. Mr. Taylor elaborated on that theory in his January 11, 2008 deposition. I have therefore also been asked by counsel to comment on the Taylor damages analysis based on the hypothetical May 26, 2006 valuation date.

On January 18, 2007, I issued an initial report in this matter. Included among the opinions expressed in that report were my estimates of Avondale's fair market value before the derailment of between $81.8 million and $122.6 million. I also projected through use of a macroeconomic variables regression model that even if the train derailment had not occurred, Avondale's revenue generating ability would continue its post-1999 decline, and it would likely have been forced into liquidation in or about the fall of 2006.

I continue to adhere to the opinions expressed in my two prior reports in this case.

**Confidential**

### III. The worsening context for Avondale's business valuation is overlooked in the Taylor December 7, 2007 report.

The Taylor Report's December 7, 2007 valuation of Avondale at May 26, 2006 report is based on calculations of cash flow projections from May 26, 2006 through August 2014. The projected cash flows used in the Taylor December 7, 2007 report are unchanged from those used in the Taylor November 2004 ESOP Report. I have previously noted my disagreement with the cash flow projections of the Taylor November 2004 Report.

The Taylor December 7, 2007 report provides no further analysis about the potential for change in the valuation context of the company for a valuation date (May 26, 2006) that is almost 18 months later than his November 2004 ESOP report. Without an analysis of the intervening period, the reader of the two Taylor reports is left with the impression that nothing in the world had changed for Avondale and its products but the train accident. That impression would be wrong.

While public company valuations had increased from February 2005 to May 2006 by 5.5%, Avondale's competitor International Textile Group ("ITG") had lost more than 23% of its publicly-traded value. Its common stock price has fallen in that time from $17.95 per share to $13.70. It has continued to decline to a current price of $2.60, in spite of restructuring for efficiency its operations in the U.S. and making more than $100 million in capital investments in mills in Latin America, Vietnam and China.[1] Table 1 on the next page reflects an indication of the changed valuation context for ITG.

After considering the dilutive effects of ITG's preferred stock offering, the stock price can be shown to have declined approximately 63% from February 2005 to December 2007. That 63% decline in ITG's stock value reveals investors' increasing pessimism about ITG's prospects for future profitability. Table 1 also reveals that the share price decline is

---

[1] "In 2006, [ITG] began construction of a 28 million yard vertical denim plant in Nicaragua. The choice of Nicaragua reflects the Company's belief that Nicaragua, and Central America generally, will be long-term providers of apparel products to the U.S. market, given their regional proximity and competitive labor base. *** The Company expects Cone Denim de Nicaragua to begin production in 2008. The cost of this project is estimated at approximately $100 million." ITG, Form 10-K, 2006, p. 8.

not explained or influenced by a general stock market decline. To the contrary, during the time that ITG stock price declined, the general stock market prices increased.

Table 1

**Indications of the changed valuation context for Avondale between early 2005 and mid-2006 valuation dates**

| Month end | ITG share price | ITG share price, adjusted to reflect shares outstanding dilution | Percent change in share price from February 2005 | S&P 500 index | Percent change in index value from February 2005 |
|---|---|---|---|---|---|
| February 2005 | $17.95 | $17.95 | | 1203.60 | |
| May 2006 | 13.76 | 13.78 | -23.2% | 1270.09 | +5.5% |
| December 2007 | 2.95 | 6.64 | -63.0% | 1468.36 | +22.0% |

Commenting on its flagging sales and profitability of products that are competitive with those of Avondale, ITG management commented on the environment in which it was trying to operate. It also commented on its hopes for the future. Given the current $2.50 stock price, investors are unimpressed by ITG management's hopes.

> Bottom weight woven apparel fabric sales continue to be negatively impacted by continued growth of imported apparel into the U.S. and the decision by the company to exit or downsize its U.S. textile apparel operations as a result of lack of profitability of many products. The company expects to begin recognizing sales at certain of its international greenfield projects in the fourth quarter of 2007. (ITG, Form 10-Q, Nov. 11, 2007, p. 52)

The decline in ITG share price also highlights the changing indicia of valuation of ITG's prospects—namely the changing risk of future cash flows. All other things constant, the riskiness in January 2005 led to a valuation of projected cash flows at a then-applicable

discount rate. The risk in May 2006 led to a substantially lower valuation evidencing a much higher risk-adjusted discount rate on investors' views of the company's future cash flows. With hindsight, we see that even investors' views at May 2006 of ITG's prospects and valuation context were wrong. Table 2 reflects the reduction in the Taylor December 2007 valuation of Avondale, using ITG valuation as a comparable. The purpose of Table 2 is not to indicate my agreement with the Taylor Report's initial assertion of $320.8 million at December 31, 2004. Rather, it is to show that the valuation context for apparel-focused textile mills continued to change to such a large extent by May 2006 that Avondale would be substantially lower valued at May 2006 from events and conditions in its operating environment entirely unrelated to the train accident.

Further, Table 2 shows that even the valuation at May 2006 is not stable. Indeed, the Avondale valuation would be only $55.1 million at approximately the date of the Taylor December 2007 Report, using Taylor's $320.8 valuation of Avondale at December 31, 2004.

**Table 2**

**The changed valuation context for Avondale**

**using its competitor ITG's valuation as an indicator**

| Month end | ITG share price, adjusted | Percent change in share price from February 2005 | Avondale valuation, Taylor Exhibit 2.0 ($millions) | Avondale Dec. 31, 2004 valuation rolled forward based on ITG as an indicator ($millions) |
|---|---|---|---|---|
| February 2005 | $17.95 | | $320.8 | |
| May 2006 | 13.78 | -23.2% | | $246.3 |
| December 2007 | 6.64 | -63.0% | | $118.7 |

The Taylor December 2007 report, which shifts the Avondale valuation date forward almost 17 months after the accident, is unreliable in its failure to address the changing valuation context for Avondale unrelated to the train accident.

IV. **Avondale's valuation at May 26, 2006, excluding consideration of the change in the valuation context and as if the accident had never occurred.**

I previously reported calculations reflecting my opinions of Avondale's value immediately prior to the train accident. Without recasting all of those calculations to an alternate valuation date, I have selected one as an exemplar.

I showed in my January 18, 2007 report that using macroeconomic variables to describe Avondale's historical sales decline and to project its prospects, using plaintiffs' proposed liquidation value of $62.7 million, and using (without agreeing) the Taylor-calculated discount rate of 14..5%, the company's enterprise value was $114.2 million (Exhibit 24b). Holding all other things constant and moving forward to a valuation date of May 26, 2006, the enterprise value using the Exhibit 24b approach was $69.8 million. If the ITG indicator market value adjustment were applied to this calculation, the resulting enterprise value at May 26, 2006 would be approximately $53.6 million. Each of these calculations addresses Avondale's enterprise value as if the train accident had never occurred.

V. **The December 7, 2007 Taylor Report attempts to remove the $100 million receipt by Avondale of insurance settlement cash from FM Global as a cash flow not related to the operations of the company. Such a removal violates Generally Accepted Accounting Principles and reflects a changed theory of the $100 million receipt.**

Avondale received $100 million on May 25, 2006 from its insurer, FM Global. I understand that the receipt was unrelated to specific property remediation invoice claims by Avondale. In contrast to the Taylor December 2007 Report assertion, such a fact circumstance requires that such a receipt be treated as a cash flow from operations.[2]

---

[2] I disagree with Mr. Taylor's avoidance of Generally Accepted Accounting Principles when performing his damages analysis in this complex litigation.

Statement of Financial Accounting Standards No. 95 (November 1987), "Statement of Cash Flows" indicates, among other things, that cash flows from operating activities include

> All other cash receipts that do not stem from transactions defined as investing or financing activities, such as amounts received to settle lawsuits; proceeds of insurance settlements except for those that are directly related to investing or financing activities, such as from destruction of a building, and refunds from suppliers. (at para. 22c).

SEC Chief Accountant Joel Levine interpreted in an SEC policy speech, "Remarks before the 2005 Thirty –Third AICPA National Conference on Current SEC and PCAOB Developments,"

> We view this guidance to mean that proceeds from insurance settlements should be classified based on the nature of the insurance coverage which gave you the right to receive payment. Said differently, classification is based on the nature of the loss that is covered by your insurance policy. Classification of the proceeds is not affected by how you spend, or plan to spend those proceeds. So, the proceeds you received under a business interruption policy would be classified within operating activities regardless of how you planned to spend them. Classification of proceeds received under a policy that protects against damage to, or loss of, your property depends on the nature of the covered property. Recovery on fixed assets owned or leased under capital leases would be an investing activity....
> (**http://www.sec.gov/news/speech/spch120605jl.htm**)

As of July 14, 2006, Avondale had treated the receipt and the gain from the receipt correctly in both its income statement (AM-TCG-RJT028944) and its statement of cash flows (AM-TCG-RJT028945). Then, inexplicably in July 2007, Avondale or Mr. Taylor changed the Avondale treatment, varying from a correct accounting treatment to one that reflected a changed theory about the receipt and the calculated gain from it (AM-TCG-RJT029231).

---

Q[Mr. Berger]: Would it be a correct statement that in terms of your damages calculations, you are not concerned about whether the Avondale financial statements are or are not kept in accordance with generally accepted accounting principles?
Mr. Russ: I object to form.
A{Mr. Taylor]: I think that's correct.

Mr. Taylor's attempt in his deposition to characterize the $100 million receipt as a loan is unsupported by the type of evidence that usually accompanies accounting judgments about loans.

In answer to a question by defense counsel about Avondale's use of the insurance proceeds, Mr. Taylor answered:

> FM has advanced of has—and there is some sort of agreement between them. But that has nothing to do with the operations of the business. It is like you borrow money from the bank to operate your business. They are basically borrowing from FM. (Taylor deposition, January 11, 2008, at 552)

A loan (or accounting liability) arises out of a company's obligation to repay based only on the passage of time. The Memorandum of Understanding ("MOU") that Mr. Taylor cited in his deposition requires a contingent event—a judgment or settlement. At best, the MOU creates a contingent liability. It does not create a loan out of the insurance receipt.

### VI. The Taylor December 7, 2007 Taylor Rebuttal Report reveals the unreliability of his initial March 23, 2007 Rebuttal report. It also reveals the failure of Mr. Taylor's procedures to appropriately identify the accounting and economic nature of Avondale's post-accident financial circumstances and independently report them to the Court.

After filing his March 2007 Rebuttal report, Mr. Taylor evidently realized that his calculation of Avondale's cash flow losses improperly included purported loss amounts that did not involve cash. For instance, Mr. Taylor discovered that Mr. Altherr had estimated the liquidation market value of some of the company's assets to be $71.7 million less than the amounts for those assets carried on the company's books. And, Mr. Taylor discovered that he had erroneously included Mr. Altherr's estimate—an estimate that did not involve a current use of cash—in his March 2007 report loss calculation.

It is not clear when or how Mr. Taylor discovered the mistake, but he removed the $71.7 million estimate from the March 23, 2007 calculations in or about July 27, 2007 and reported the change in his December 7, 2007 report.. I note that such a removal, taken alone, would cause Avondale's alleged $21.2 million post-accident cash flow loss through

May 26, 2006 (Taylor Rebuttal Report, March 23, 2007, Exhibit 1.0) to become a cash flow profit of $50.7 million.

In Section V above, I described Mr. Taylor's change in the treatment of the May 25, 2006 receipt by Avondale of $100 million insurance proceeds. When combined with his corrections to remove non-cash expenses or losses (including the specific $71.7 million error), the resulting picture painted Avondale as having sustained net cash losses of $71.5 million during the post accident period through May 26, 2006 (Taylor Rebuttal Report, December 7, 2007, Exhibit 1.0(A)).

The timing of the discovery and reporting of each of these changes is disappointing. One would expect that Mr. Taylor's more than 20 years of working for Avondale would have gained him unfettered access to Mr. Altherr and Avondale's books and records for the preparation of his March 7, 2007 report. His belated discovery of the errors reveals at least a failure of his and his firm's procedures to appropriately identify the accounting and economic nature of Avondale's post accident financial circumstances. The failure underscores the unreliability of the March 7, 2007 report, and raises questions as to whether the procedures and the December 7, 2007 report have been fully corrected.

### VII. Basis and Reasoning

In connection with the development of my opinions in this matter, members of my staff and I have considered many documents that have been produced during discovery. Additionally, I have considered many publicly available documents and treatises, as well as the expert rebuttal reports that recently been issued by plaintiffs in this case. Exhibit 1 reflects the additional documents I have considered since the filing of my June 11, 2007 surrebuttal report.

My opinions are also based on my education, training, and experience, and are supported by computations attached to this report as Exhibit 2.

Confidential

## VIII. Compensation

FTI is compensated at an hourly rate per hour of time incurred for this engagement. My hourly rate for this is engagement is $425 per hour. Neither FTI's nor my compensation is contingent on the outcome of this matter or the substance of my findings and conclusions.

\* \* \* \* \* \*

I reserve the right to consider my opinions in light of any additional documents or information that I become aware of during the discovery process. Furthermore, I reserve the right to change or modify this report as is appropriate based on this new information.

Respectfully Submitted,

*[signature]*

David B. Lasater

Confidential

**Exhibit 1**

**Additional Documents Considered Since June 11, 2007**

Deposition Transcript: Jack Altherr dated June 27, 2007 in *Avondale Mills, Inc. v. Norfolk Southern Corp., et al.*, No. 1:05-2817:MBS

Deposition Transcript: David Lasater dated June 22, 2007 in *Avondale Mills, Inc. v. Norfolk Southern Corp., et al.*, No. 1:05-2817:MBS

Deposition Transcript and Exhibits: Robert Taylor dated January 11, 2008 in *Avondale Mills, Inc. v. Norfolk Southern Corp., et al.*, No. 1:05-2817:MBS

Defendants Norfolk Southern Corporation and Norfolk Southern Railway Company's Motion to Exclude the Expert Testimony of Robert Taylor on Lost Business Value on Grounds of Lack of Relevance

Expert Report: Robert J. Taylor Corrected December 7, 2007 in *Avondale Mills, Inc. v. Norfolk Southern Corp., et al.*, No. 1:05-2817:MBS

Memorandum of Law in Support of Norfolk Southern's Motion to Exclude the Expert Testimony of Robert Del Genio on Grounds of Lack of Relevance

Motion Hearing Transcript dated September 7, 2007 in *Avondale Mills, Inc. v. Norfolk Southern Corp., et al.*, No. 1:05-2817:MBS

Motion Hearing Transcript dated September 14, 2007 in *Avondale Mills, Inc. v. Norfolk Southern Corp., et al.*, No. 1:05-2817:MBS

Motion Hearing Transcript dated September 17, 2007 in *Avondale Mills, Inc. v. Norfolk Southern Corp., et al.*, No. 1:05-2817:MBS

Plaintiffs' Response to Norfolk Southern's Motion to Exclude The Expert Testimony of Robert Taylor on Lost Business Value on Grounds of Lack of Relevance

Plaintiffs' Response to Norfolk Southern's Motion to Exclude The Expert Testimony of Robert Taylor under Daubert and F.R.E. 702

Plaintiffs' Memorandum in Opposition to Norfolk Southern's Motion to Exclude the Expert Testimony of Robert Del Genio

Plaintiffs' Response to Norfolk Southern's Motion to Exclude The Expert Testimony of Robert Del Genio on Grounds of Lack of Relevance

Defendant Norfolk Southern's Motion in Limine For Ruling That Avondale Must Include In Its Final Liquidation Value The $100 Million Payment It Received From Facotry Mutual Immediately Before Deciding to Cease Operations

Reply in Support of Defendant Norfolk Southern's Motion in Limine For Ruling That Avondale Must Include In Its Final Liquidation Value The $100 Million Payment It Received From Facotry Mutual Immediately Before Deciding to Cease Operations

AM-MRE-SOA008972 - AM-MRE-SOA009663

AM-MO-JRA-GF005766 – AM-MO-JRA-GF005785

AM-TCG-RJT028802 – AM-TCG-RJT029407

PWC 0000655

PWC 0003511 – PWC 0003526

International Textile Group, Inc., Form 10-Q, for the period ending 9/30/07

2

Exhibit 24b (May 26, 2006 Valuation Date)
Forecasted Income Statement and Enterprise Valuation Using Regression Model Estimated Thru 12/2004
Amounts in Thousands

| | Actual | | | Forecast | |
|---|---|---|---|---|---|
| | 12 Mths End 8/29/2003 | 12 Mths End 8/27/2004 | Notes | 12 Mths End 8/26/2005 | 12 Mths End 8/25/2006 |
| Net Sales | $ 590,862 | $ 564,777 | (1) | $ 602,529 | $ 493,716 |
| Cost of Goods Sold | 507,846 | 511,305 | (2) | 545,482 | 446,972 |
| Sales less COGS | 83,016 | 53,472 | (2) | 57,046 | 46,744 |
| Depreciation | 41,842 | 36,732 | (3) | 33,586 | 30,000 |
| SG&A Expense | 26,143 | 25,909 | (4) | 26,555 | 21,760 |
| Facility Restrucuring | 2,450 | 1,680 | (5) | - | - |
| Total Cost and Expenses | 578,281 | 575,626 | | 605,624 | 498,732 |
| Operating Income (Loss) | 12,581 | (10,849) | (6) | (3,095) | (5,016) |
| Interest Income (Expense) | (19,034) | (17,788) | (7) | (17,220) | (17,220) |
| Other Income (Expense) | 52 | 2,904 | (7) | - | - |
| Gain (Loss) on Extinguishment of Debt | (3,236) | 17,000 | | - | - |
| Expense on Sale of Receivables | (2,596) | (2,419) | (8) | (1,785) | (1,785) |
| Income Before Taxes | (12,233) | (11,152) | | (22,100) | (24,021) |
| Income Taxes | (4,495) | (4,915) | (9) | (7,956) | (8,647) |
| Net Income (Loss) | $ (7,738) | $ (6,237) | | $ (14,144) | $ (15,373) |

Confidential

Exhibit 24b (cont'd)

|  | Actual | | Forecast | |
|---|---|---|---|---|
|  | 12 Mths End | 12 Mths End | 12 Mths End | 12 Mths End |
|  | 8/29/2003 | 8/27/2004 | 8/26/2005 | 8/25/2006 |
| **Enterprise Value Calculation** | | | | |
| EBIT | 10,037 | (10,364) | (4,880) | (6,801) |
| Less: Tax (Provision)/Benefit from above | 4,495 | 4,915 | 7,956 | 8,647 |
| Less: Tax Shield on Interest Expense @ 36% Tax Rate | (6,852) | (6,404) | (6,199) | (6,199) |
| Unlevered Net Income | 7,680 | (11,853) | (3,123) | (4,352) |
| Add: D&A | 42,204 | 37,268 | 33,985 | 30,399 |
| Less: Capital Expenditures | (12,765) | 567 | (10,000) | (12,500) |
| Less: Increase/(Decrease) in Non-Cash Working Capital | (6,911) | 8,354 | (1,551) | (15,119) |
| Less: Decrease/(Increase) in Deferred Taxes | 6,212 | 5,764 | 1,129 | 3,808 |
| Unlevered Free Cash Flow | 37,818 | 11,864 | 21,284 | 24,858 |
|  |  |  |  |  |
| Unlevered Free Cash Flow Before Capital Expenditures | 50,583 | 11,297 |  | 37,358 |
| Unlevered Free Cash Flow Before Capital Expenditures (Last 3 Months of FY 2006) |  |  |  | 9,339 |
| Discount Term (Mid-Year Convention, in Months) |  |  |  | 1.5 |
| Discount Factor @ 14.5% |  |  |  | 0.983 |
| Discounted Unlevered Free Cash Flow Before Cap. Ex. (Last 3 Months of FY 2006) |  |  |  | 9,183 |
|  |  |  |  |  |
| Liquidation Value |  |  |  | 62,700 |
| Discount Term (Mid-Year Convention, in Months) |  |  |  | 3.0 |
| Discount Factor @ 14.5% |  |  |  | 0.967 |
| Discounted Liquidation Value (as of 5/26/2006) |  |  |  | 60,613 |
|  |  |  |  |  |
| PV of Unlevered Free Cash Flows Before Cap. Ex. (as of 5/26/2006) |  | $ 9,183 |  |  |
| PV of Liquidation Value |  | 60,613 |  |  |
| Enterprise Value (as of 5/26/2006) |  | $ 69,796 |  |  |

Confidential

**Notes to Exhibit 24b:**

(1) Net sales are forecasted using a regression model for FY 2005 and 2006.

(2) COGS and Gross Profit Margins for FY 2005-2006 are assumed to be equal to FY 2004 margins.

(3) Depreciation estimates for FY 2005-2006 are from the Taylor Consulting Group's ESOP valuation report, dated 12/31/2004.

(4) SG&A expenses for FY 2005-2006 are forecasted by calculating the average percentage of SG&A expenses as a percent of net sales for FY 1999-2004. This percentage is then applied to forecasted sales for FY 2005-2006 to forecast SG&A expenses.

(5) Facility restructuring expenses are assumed to be $0 a year for FY 2005 and thereafter.

(6) Interest expense for FY 2005 and 2006 is forecasted using an internal company forecast. For FY 2006, we utilized the forecasts from the Taylor Consulting Group's ESOP valuation report, dated December 31, 2004.

(7) Other Income (Expense) and Gain (Loss) on Extinguishment of Debt are assumed to be $0 for FY 2005-2006.

(8) For FY 2005-2006, we utilized the forecasts from the Taylor Consulting Group's ESOP valuation report, dated December 31, 2004.

(9) We assumed a tax rate of 36.0%, as per the assumptions in the Taylor and Del Genio reports.

Confidential