# ATTACHMENT 3

# SUPPLEMENTAL SURREBUTTAL REPORT OF CRAIG T. ELSON

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

CIVIL ACTION NO. 1:05-2817-MBS

- - - - - - - - - - - -

AVONDALE MILLS, INC.,

                                                PLAINTIFF,

VS.

NORFOLK SOUTHERN CORPORATION,
NORFOLK SOUTHERN RAILWAY COMPANY,
BENJAMIN AIKEN,
MIKE FORD,
AND JAMES THORNTON

                                                DEFENDANTS.

February 1, 2008

# LECG, LLC

## I. OVERVIEW

### *A. Introduction*

I, Craig T. Elson, am a Senior Managing Director of LECG, LLC ("LECG"), and the Managing Director of LECG's Chicago, Illinois office. LECG has been retained by Spriggs & Hollingsworth on behalf of their clients, Norfolk Southern Corporation and Norfolk Southern Railway Company (collectively "Norfolk Southern" or "Defendants"), in connection with claims made against Norfolk Southern by Avondale Mills, Inc.,[1] ("Avondale" or "Plaintiff") as described in the Second Amended Complaint dated August 8, 2006 ("Complaint"). In connection with LECG's work on this assignment, I filed an initial expert report dated January 22, 2007 ("January Report") and a subsequent expert report dated June 11, 2007 ("Surrebuttal Report"). I was deposed on July 3, 2007. This report, dated February 1, 2008 ("2008 Report"), sets forth my observations and opinions regarding the recently submitted "corrected" report of Robert Taylor, the Plaintiff's valuation and damages witness, dated December 7, 2007 ("Corrected Taylor Report" or the "Corrected Report").[2,3]

### *B. Background and Qualifications*

I have set forth my background and qualifications in my January Report, including my curriculum vitae and prior deposition and trial testimony experience as of those dates. Attachment A to this report includes an updated deposition and trial testimony disclosure.

### *C. Basis of Compensation*

LECG is being compensated for work performed in connection with this engagement at my customary hourly billing rate of $695 per hour, plus out of pocket expenses incurred in connection with services rendered. LECG professional staff assigned to this project are also billed at customary hourly billing rates, ranging from $195 to $525 per hour.[4]

---

[1] Avondale Incorporated is the parent of a wholly owned operating subsidiary, Avondale Mills, Inc. Hereafter, "Avondale" will be used to refer to the collective organization.

[2] While this report represents my observations through the date of submission (February 1, 2008), I respectfully reserve the right to supplement or amend my observations and quantifications set forth herein on the basis of information which may become available subsequent to the submission of this report, or for other reasons.

[3] The report submitted by Mr. Taylor on December 7, 2007 has been put forth as a "corrected" version of Mr. Taylor's Rebuttal Report (originally submitted March 23, 2007). As detailed herein, Mr. Taylor's "corrections" include 9 noted changes to his original rebuttal report (Taylor Corrected Report at page 15).

[4] These rates are reflective of LECG's customary annual rate increases which became effective December 1, 2007.

2

### D. Information Reviewed

In connection with this engagement, I, and/or members of my staff, have reviewed documents produced in connection with these proceedings as well as certain independently compiled information. The documents that have been considered in rendering the opinions set forth herein, beyond those previously disclosed in my January Report or Surrebuttal Report, are identified in Attachment B to this report.

### E. Summary of Items to be Addressed

I have been asked to review the Corrected Taylor Report, and related depositions with focus on the corrections and changes described therein, including Mr. Taylor's Corrected Exhibit 1 which sets forth his revised quantification of alleged damages in this matter.

### F. Summary of Conclusions[5]

1. I continue to remain of the opinions set forth in my January Report. Nothing contained in the Corrected Taylor Report causes me to modify, alter or otherwise change my opinions as set forth therein.[6] Likewise, I remain of the opinions and conclusions as set forth in my Surrebuttal Report, although Mr. Taylor, in his Corrected Report, attempts to correct for certain of the errors and mistakes that I discussed in my Surrebuttal Report.[7] More specifically, as noted in my Surrebuttal Report, "I remain of the opinion, as articulated in my January Report, that Avondale did not suffer any economic harm resulting from the loss of its enterprise value.[8] My valuation of Avondale, which was, and remains based on reasonable assumptions, consistent with the Company's recent historical performance as well as known industry and regulatory considerations, indicates that Avondale's value in liquidation exceeded its pre-derailment value. As a result, the value maximizing proposition for Avondale's stakeholders would have been to liquidate the business, prior to the date of the derailment. In doing so, Avondale would have avoided the consequential damages in the form of business interruption damages which Mr. Taylor asserts the Company sustained.[9] Where

---

[5] The fact that I have not addressed herein each and every aspect of Mr. Taylor's Corrected Report should not be construed as agreement with positions set forth therein.

[6] A summary of my conclusions is set forth on p. 5 of my January Report. Notably, my January Report addresses the issue of causation. Mr. Taylor's analysis, even as corrected, nonetheless continues to be predicated on the *assumption* that the derailment *caused* the loss of Avondale's business value. His Corrected Report, therefore, still fails to establish that the losses he quantifies causally resulted from the derailment.

[7] Mr. Taylor, in his Corrected Report, has, for example, presented a consolidation of both gains and losses associated with liquidation, partially addressing one of the criticisms which I noted in my Surrebuttal Report.

[8] See January Report at pages 90 – 91.

[9] See Taylor Rebuttal Report at Exhibits 1 through 2.

3

Mr. Taylor adds business interruption losses (covering the period from derailment to liquidation) to Avondale's alleged lost enterprise (asset) value at the time of liquidation, my analysis simply, and importantly, takes the entire period into consideration. I conclude that, with respect to both periods, Avondale would have been better off economically had it liquidated before the derailment since liquidation was the economically rational alternative, had the derailment occurred or not."[10]

2. Despite failing to properly address and account for my previously articulated criticisms of his analysis, Mr. Taylor's Corrected Report contains new and additional flaws which further render his quantification of damages unreliable. These flaws include, among other things, improper assumptions informing his May 26, 2006 valuation date, overstatement of damages in connection with his treatment of non-operating assets, and inappropriate treatment of certain other assets and liabilities within his damages model, among other things.

## II. REVIEW OF CORRECTED TAYLOR REPORT

### A. Background Leading Up To The Corrected Taylor Report

The Plaintiff first proffered opinions regarding Avondale's allegedly lost business value in a July 26, 2006 report (hereafter the "CDG July Report") authored by Mr. Robert Del Genio of Conway Del Genio ("CDG"). Among other things, my January Report responded to Mr. Del Genio's analyses and the conclusions contained therein. On March 23, 2007, Mr. Taylor filed a report ("Taylor Rebuttal Report") which set forth, among other things, his opinions in response to my January Report. In significant measure, the Taylor Rebuttal report adopted the prior valuation methodologies, conclusions, and opinions originally contained in the CDG July Report. However, the Taylor Rebuttal Report introduced new calculations which, among other things, revised the pre-derailment valuation date of Avondale selected by Mr. Del Genio to May 26, 2006 (Avondale's selected date of discontinuance of operations), and also set forth (or reiterated) additional elements of claimed damages associated with alleged business interruption claims (i.e., lost profits from the derailment date through May 26, 2006) and consequential damages (e.g., remediation costs) that had been previously disclosed in an earlier Taylor Report (dated July 29, 2006) and in a report submitted by Mr. Oliver Wood (dated July 31, 2006). On June 11, 2007, I filed a Surrebuttal Report which responded to certain elements of the Taylor Rebuttal Report.[11] On December 7, 2007 Mr. Taylor filed an additional version of his Rebuttal Report, which he has now characterized as a

---

[10] See my Surrebuttal Report at p. 7-8. Also note that the liquidation expenses, outlined in the Corrected Taylor Report, would have been expended regardless, under the economically rational decision to liquidate Avondale's business prior to the derailment.

[11] On July 3, 2007 I was deposed in this matter. The Plaintiff's witness Mr. Taylor was deposed in this matter on June 4, 2007 and January 11, 2008. Mr. Del Genio was deposed on December 13, 2006 and May 24, 2007.

4

"corrected" version of the Taylor Rebuttal Report (the Corrected Taylor Report).[12] The Corrected Taylor Report contains a list of nine corrections and updates to his previously filed Rebuttal Report. These corrections and updates are described by Mr. Taylor on page fifteen of his Corrected Report. Incorporating these nine modifications to his earlier analysis, Exhibit 1 to the Corrected Taylor Report presents a "revised" damages claim aggregating $421.8 million. This amount is comprised of alleged consequential damages, business interruption losses and lost business value purported to have been sustained by Avondale resulting from the derailment, offset by amounts received, and expected to be received, by Avondale from the sales or liquidation of its assets. The net impact of Mr. Taylor's "corrections" reduced the amount of claimed damages (as contained originally in the Taylor Rebuttal Report) by a total of approximately $21.6 million ($443.4 million less $421.8 million).

*B. Observations Regarding The Characterization And Scope of Select Taylor Corrections*

Of the nine articulated changes informing the Corrected Taylor Report, two are qualitative, or apparently cosmetic (including updates to source documents and corrections of typographical errors or clarifications of unclear statements contained in Mr. Taylor's Rebuttal Report), one relates to updating his quantifications for additional financial data made available subsequent to his March 23, 2007 Rebuttal Report, and one, characterized as a "point of information" only, added the value of assets characterized as "non-operating" to Mr. Taylor's estimates of both liquidation proceeds and enterprise value. Mr. Taylor asserts that his "informational disclosure" had "no impact on damages" as originally quantified in his Rebuttal Report. The remaining five adjustments constitute methodological changes in his approach to quantifying damages, and have the effect of reducing claimed damages from amounts previously quantified, on a net basis.[13]

As an initial consideration, none of the identified "substantive" changes to the amount of quantified damages responded to, or appropriately accounted for, many of the criticisms of the Plaintiff's claim for damages as discussed in my January and Surrebuttal Reports. For example, Mr. Taylor's Corrected Report does not appropriately address causation, but instead "assumes" that, absent the derailment, Avondale would have remained viable when prevailing, pre-derailment circumstances indicate otherwise. Similarly, Mr. Taylor assumes that, had the derailment not occurred, Avondale would have performed *entirely*

---

[12] Mr. Taylor was deposed on June 4, 2007 and January 11, 2008. Mr. Altherr was deposed on October 31, 2006, November 1, 2006, June 27, 2007 and December 14, 2007.

[13] For example, in correcting his Rebuttal Report, Mr. Taylor "corrected" his calculation of damages associated with post May 26, 2006 Avondale operations by more than $26 million to account for errors in his prior analysis. (See e.g., Taylor workpapers at AM-TCG-RJT028887 and Taylor Deposition at pages 518-524). It should be noted that this total post May 26, 2006 loss difference of approximately $26.6 million is more material on a methodological basis than it appears as a result of mathematical netting of several figures. For example, included in this figure is the correction of the failure to account for other material non-cash gains and losses and an approximately $20 million reversal of Mr. Taylor's position regarding tax treatment of post May 26, 2006 losses (estimated as $55.7 million in post May 26, 2006 losses x a 36% estimated tax rate). (See, e.g., Taylor January 11, 2008 Deposition at pages 604-612 for his discussion on post May 26, 2006 losses. See also Taylor Deposition Exhibits 1, 2 and 15).

5

*consistent* with expectations held prior to the derailment, when clearly such expectations can be demonstrated unreliable in the face of post-derailment circumstances that were unaffected by the derailment. And, despite objective evidence of significant declining trends characterizing the pre-derailment Avondale, Mr. Taylor simply and inexplicably adopts unsupported assumptions that Avondale would have reversed these clearly evident trends of significantly deteriorating pre-derailment financial performance in post-derailment periods (assuming that the derailment had never happened). Particularly astounding is that Mr. Taylor adopts these assumptions for purposes of quantifying damages, when Mr. Taylor's own ESOP valuations, prepared prior to the derailment, demonstrated significantly different valuation conclusions,[14] and a report provided to the Avondale Board of Directors by Mr. Del Genio in connection with the decision to liquidate, highlighted continuing problems in Avondale's industry.

Irrespective of Mr. Taylor's failure to appropriately address both the above described, and other deficiencies embedded in his damages study as set forth in my January and Surrebuttal Reports, Mr. Taylor's revised damage computation, as set forth in Exhibit 1 to his Corrected Report, evidences additional methodological and computational errors and omissions as discussed below.

### C. Selection of May 26, 2006 as the Date To Measure Alleged Lost Business Value

In both his Rebuttal Report and Corrected Report, Mr. Taylor effectively "shifted" the valuation date corresponding to the lost business value element of the Plaintiff's damage claim from the date of derailment (originally selected by Mr. Del Genio as part of *his* damage study) to May 26, 2006 (the date corresponding to Avondale's decision to liquidate its business). In modifying the valuation date some seventeen months from that originally selected by Mr. Del Genio, Mr. Taylor, however, largely adopted the projections of financial performance utilized by Mr. Del Genio in his analysis.[15] These projections of financial performance for Avondale were based on expectations developed prior to the derailment. By simply shifting the valuation date forward seventeen months without modifying expectations of future financial performance to account for (non-derailment) changing circumstances occurring during that interval, Mr. Taylor effectively assumes that circumstances bearing on the financial prospects of Avondale were *identical* in late 2004 to those prevailing in May 2006. Mr. Taylor acknowledged as much at his recent deposition.

---

[14] See December 31, 2004 Valuation of Class A Common Stock of Avondale Incorporated ("ESOP Valuation") prepared by Taylor Consulting Group as of December 31, 2004 (AM-MRE-GF031706 – 54). Avondale's enterprise value, quantified by Mr. Taylor in this report, approximates $255 million (inclusive of roughly $6 million in non-operating assets).

[15] Specifically, these modifications include Mr. Taylor adjusting the original CDG valuation date from 11/30/04 to 12/31/04, applying a Gordon Growth terminal valuation computation (versus an EBITDA multiple approach used in the CDG report), and in the case of the $295 million enterprise value conclusion, a reduction in the terminal growth rate from Mr. Taylor's computed 3.25% to 2.00%.

> "Q. I don't think you understood my question, perhaps. Let me try it again. I am saying when you shifted the valuation date and kept this value of $306 million, did you make any adjustments for what had actually happened in the textile industry during that intervening period?
> A. Not specifically. Our view is that the economics prospects for Avondale were largely unchanged. I did recognize some increased costs for some element of cost that may not be able to be passed on to customers. But we felt at that time that the prospects for Avondale were consistent with what we did in that first report."[16]

Given the above, Mr. Taylor acknowledges that he did not specifically attempt to evaluate, or otherwise account for, any changes in industry dynamics and/or economic factors, or factors specific to Avondale, between the derailment and May 26, 2006. Rather, he assumed maintenance of the status quo, without analysis to support the assumption. Analysis of the fact record demonstrates the implausibility of his "status quo" assumption, and the illogical nature of this predicate assumption. In fact, analysis of the case record and documents prepared by Avondale's own valuation expert (CDG) and other consultants (KSA) who made contemporaneous evaluations of Avondale's prospects, as of, or proximate to May 26, 2006 belie his assumption.[17]

For example, Avondale's Board, when evaluating whether or not to liquidate its business in May 2006, received a contemporaneously prepared valuation analysis prepared by CDG. That valuation analysis, reflecting a summary of enterprise values ranging between $77 million and $181 million as of May 2006, evidences a substantial decline in value from that asserted by Mr. Taylor in his Corrected Report ($306 million exclusive of non-operating assets). Mr. Taylor however, will likely contend that the CDG valuation is not reliable for purposes of computing lost business value because the valuation performed by CDG was reflective of Avondale in a "damaged" condition[18] rather than reflective of how Avondale would have existed sans derailment affects.

First, as demonstrated in my January and Surrebuttal Reports, assets alleged to have been irrevocably damaged by the derailment are not the likely cause of Avondale's financial deterioration leading up to Avondale's May 26, 2006 liquidation. As my January Report

---

[16] See the January 11, 2008 Deposition of Mr. Taylor at page 701. See also his testimony at pages 701 – 707 for his additional explication of the premise that he should be valuing Avondale as if full remediation had been achieved, and business operations would commence from that date. However, despite this attempt at justifying his new valuation date premise, Mr. Taylor still fails to consider all non-derailment factors that occurred between the derailment and May 26, 2006.

[17] See my January Report at pages 29, 65 – 67. See also the May 26, 2006 CDG Stand-alone Report which highlighted the altered industry and competitive environment in which Avondale operated as significant factors in their pessimistic outlook for Avondale (and recommendation that it liquidate it business). In the CDG Stand-alone Report, beginning at page 32, CDG provided a summary range of enterprise values for Avondale from $77 million to $181 million, far less than Mr. Taylor's concluded value (of approximate $306 or $332 million as of May 26, 2006). Mr. Taylor does not account for this contemporaneous conflicting valuation on which Avondale relied, in part, to justify its liquidation decision. See the CDG Stand Alone Report at pages 8-12, 16, 24 and 33. See also the Draft Report of Kurt Salmon and Associates (hereafter "KSA") dated May 15, 2006 provided to King & Spaulding and Avondale Management regarding projected declines in textile segments produced by Avondale.

[18] See January 11, 2008 Taylor Deposition at page 709.

7

discusses in considerable detail, each of Avondale's major divisions,[19] was able to return, subsequent to the derailment, to the cost levels generally consistent with those observed in Avondale's pre-derailment periods.[20] This evidence strongly indicates that Avondale's assets were not irrevocably damaged by the derailment, and rather other non-derailment factors caused Avondale's financial deterioration.

Furthermore, CDG's May 2006 analysis indicates that, when actual remediation expenses are considered and removed from the analysis, Avondale, viewed without expense factors associated with the derailment, was nonetheless expected to generate negative EBITDA, unfettered by derailment effects. The table below, as contained in CDG's May 26, 2006 Stand-alone Business Assessment presented to the Board, highlights that Avondale was projecting to generate negative EBITDAR[21] *even when the remediation is assumed and business interruption costs are added back to projected EBITDA.*[22]

CDG May 26, 2006 Report Table

| EBITDA Derailment Reconciliation ($000) | Projected FY 2006[23] | |
|---|---|---|
| | Low | High |
| EBITDA | ($12,519) | ($12,519) |
| Derailment Adjustments | | |
|    Uninsured Loss – Norfolk Southern Expense[24] | 6,844 | 6,844 |
|    Management Estimated Business Interruption Costs | 3,000 | 5,000 |
|    Severance Pay Expense[25] | 191 | 191 |
| Total Adjustments | $10,035 | $12,035 |
| **Adjusted EBITDAR**[26] | **($2,484)** | **($484)**[27] |

---

[19] See my January Report at pages 56 - 65. Nor do the lost sales arguments raised by Avondale indicate that the derailment caused the loss of major business or customers. Id. at page 39 – 51.

[20] See my Surrebuttal Report at page 10. See also my January Report at pages 43 – 46. It should also be noted that Avondale was able to generate positive EBITDA for approximately ten months following the derailment (i.e., until October 2005). Not until November 2005 did Avondale begin to generate negative EBITDA. See my January Report Exhibits 2.4 and 2.5.

[21] Defined by Avondale as earnings before interest, taxes, depreciation, amortization and restructuring charges.

[22] See the CDG May 26, 2006 Stand-alone Report. AM-MRE-GF016199 – 248 (at page 16).

[23] FY 2006 projections include actual results for the eight months through April 2006 and assume continued operations and remediation (excludes impact of insurance settlement). This note is as originally contained in the May 26, 2006 CDG Stand-alone Report.

[24] Expense included in Corporate Sundry Expense on Consolidated Income Statement. This note is as originally contained in the May 26, 2006 CDG Stand-alone Report.

[25] Expense included in Corporate Sundry Expense on Consolidated Income Statement. This note is as originally contained in the May 26, 2006 CDG Stand-alone Report.

[26] Defined as earnings before interest, taxes, depreciation, amortization and restructuring charges. This note is as originally contained in the May 26, 2006 CDG Stand-alone Report.

8

Therefore, Mr. Taylor's claim that he can effectively ignore the well accepted valuation principle that requires consideration of relevant information *as of the valuation date* is erroneous. Contemporaneous CDG forecasted losses and the lack of proof of causation for such losses discussed above demonstrates that Mr. Taylor's purported May 26, 2006 valuation of Avondale is bereft of contemporaneous industry (and Avondale specific) information and trends, is overstated, and should be dismissed as an unrealistic and methodologically flawed enterprise value.

Considering my pre-derailment valuation date and the resultant enterprise value which I have determined ($134 million), I remain of the opinion that the date prior to the derailment is the most reasonable for purposes of assessing potential damage resulting from the derailment, particularly considering that the economically prudent action for Avondale's stakeholders, based on my concluded valuation, was to liquidate the business prior to the derailment. Additionally, if I were to hypothetically adopt a May 26, 2006 valuation date as being appropriate, considering the continued degradation of the industry, in addition to Avondale's seven consecutive months of operating losses leading up to the May 26, 2006 value, my hypothetical May 26, 2006 valuation would have been substantially lower than the $134 million value I previously quantified in my January Report.

### D. Mr. Taylor's Application of Non-Operating Assets Within His Damages Calculation

In his Corrected Report, Mr. Taylor characterizes his discussion of non-operating assets as a "point of information" with no impact on damages.[28] However, without further evidence, analysis, or documentation produced in discovery,[29] the appropriateness of Mr. Taylor's assertion of "no impact" cannot be fully verified. In fact, as discussed later herein, this assertion is likely erroneous. Regardless, in support of his contention that his treatment of non-operating assets has no effect on damages, Mr. Taylor adds $25,799,000 (approximately $26 million) to both the total enterprise value in his Corrected Exhibit 1 (serving as an addition to total damages) while adding the very same value as an offset to damages otherwise quantified on Corrected Exhibit 1 (serving as an increase to liquidation proceeds). All things being equal, this treatment might theoretically serve to

---

[27] Furthermore, the CDG Stand-alone Report noted that the 2006 projections could be aggressive. "Management has indicated that the projections for the last four periods of fiscal 2006 may be aggressive based on current business conditions, which could lead to a reduction of projected FY 2006 EBITDA, as shown above, of $2 to $3 million." (See page 16). The CDG report also highlighted other factors, independent of the derailment, bearing on Avondale. "*Even with a return to its normal operations*, the Company would still be faced with declining sales volumes and customer pricing pressure." Emphasis added. (See page 24). "Additionally, current excess capacity issues in the domestic market will continue to create downward pressure on Avondale's value." (See page 34).

[28] Mr. Taylor believes that, because non-operating assets are added to both Avondale's enterprise value (i.e., increasing damages) as well as its iquidation proceeds (i.e., an offset to damages) that these figures net to zero and thus have no net impact on his total damage quantification.

[29] I understand from counsel that discovery is still open on this issue.

9

increase and offset the addition to damages on a dollar for dollar basis. This issue is far from clear. For example, after questioning regarding the origin of the approximately $26 million dollars, Mr. Taylor's deposition responses indicate he deferred significantly to discussions with Mr. Altherr as verification of the composition of, and value ascribed to, these assets.[30]

Without explicit knowledge of the character and value ascribed to discrete non-operating and operating assets (both pre-and post-derailment), an objective analyst cannot rule out that at least some assets (which are currently being characterized as non-operating by Avondale and Mr. Taylor for damage quantification purposes) were already included as the operating assets giving rise to the projected cash flows informing Mr. Taylor's $306 million discounted cash flow enterprise value calculation. As discussed below, this is likely the case.

A potential overstatement in damages concerning Mr. Taylor's treatment of non-operating assets is evident given that Avondale (and importantly, by virtue of his reliance on Avondale data, Mr. Taylor) had estimated values for such assets in the past in amounts significantly less than $26 million. Past values ascribed to non-operating assets by Avondale historically ranged from $6-12 million.[31] With much lower values assigned to non-operating assets historically, the updated $26 million dollar value for non-operating assets frames an overstatement of damages of as much as $14 to $20 million dollars if such historical estimates of non-operating are deemed credible. Similarly, if the historical Avondale estimates of non-operating assets are unsupported, the overstatement of damages could range up to the full value of $26 million. Furthermore, an example of Avondale's recent allocation of liquidation proceeds at Graniteville, generally calls into question the reasonableness for Mr. Taylor's treatment of non-operating assets in his damages calculation.[32]

---

[30] See the January 11, 2008 Deposition of Mr. Taylor at page 721.

[31] See e.g., the CDG July Report at page 40 (with values ranging from $6 to 10 million), see Mr. Taylor's 12/31/04 ESOP stock valuation (with values ranging from $6 to 10 million), and see also Mr. Altherr's memo regarding non-operating asset estimates (Altherr Deposition Exhibit 89 with values ranging from $10 to $12 million).

[32] For example, Mr. Felker's recent deposition testimony indicates that in April 2007, approximately $10 million of Graniteville assets were sold, of which $7.8 million was classified as non-operating. The remaining approximately $2.2 million was, according to Mr. Felker, considered operating. See Mr. Felker's January 28, 2008 Deposition at pages 60-75, (rough transcript). Beginning with the logical assumption that the $7.8 million of non-operating assets discussed by Mr. Felker is included in the $26 million of non-operating assets as set forth in the Taylor Corrected Exhibit 1.0, any portion of the $7.8 million which was considered an operating asset at the time of the derailment would represent an overstatement of damages. Mr. Felker acknowledged that there were Graniteville assets considered operating in nature at the time of the derailment that were included in the $7.8 million quantification of non-operating assets at the time of sale. Examples included the Gregg Warehouse, the administrative building, their respective adjacent parking lots, as well as the Warrenville Administration building. See Mr. Felker's January 28, 2008 Deposition at pages 38 and 71 (rough transcript) and AM-MRE-SOA008341-42. Other assets involved in Graniteville operations and discussed in detail in Mr. Felker's deposition include the process water supply for the Gregg Plant and other plants at Graniteville, as well as the equalizing lagoon used by Avondale to treat its wastewater. Logically, the real estate underlying such

*E. Portions of Other Assets and Liabilities Are Inappropriately Treated As A Reduction To Liquidation Proceeds*

In computing damages, Mr. Taylor has quantified certain liabilities of Avondale (either existing prior to the derailment or accrued thereafter) as elements of damage, by recognizing the actual (or estimated future) payments of such liabilities as an offset to expected liquidation proceeds. He accounts for those liabilities in two discrete components; pre-derailment (as of 12/31/04) and post-derailment (post-12/31/04 leading up to the final 8/31/07 balance sheet).

    i.    Pre-derailment Other Assets and Liabilities

Mr. Taylor first determines Avondale's pre-derailment other long-term liabilities[33] in his Corrected Exhibit 1.0 as $27,123,000 (approximately $27 million). As support for this value he provides a schedule and handwritten notes from Mr. Altherr.[34] These documents indicate that the pre-derailment other long-term liabilities were substantially comprised of approximately $15.915 million of deferred income taxes, and approximately $11.509 million of other liabilities. The $11.509 million in liabilities, which is incremental to what was included in Mr. Taylor's March 2007 report, is described in Mr. Taylor's notations as "liabilities from post-retirement benefits, phantom stock, special retirees and accrued environmental claims." All of these liabilities arose pre-derailment.

Mr. Taylor's analysis is flawed here, because despite assuming that payment of these obligations constitutes damage to Avondale, payment of the $11.5 million in pre-derailment Avondale liabilities (other deferred charges) was unaccounted for in his DCF calculations supporting his approximate $332 million enterprise value. To this point, nowhere in his DCF analysis could Mr. Taylor identify where payment of the pre-derailment liabilities, such as environmental liabilities, was accounted for in terms of a reduction to the projected cash flows informing his value.[35]

> "Q. In calculating the cost part of that cash flow projection, is there a specific line item that subtracts out cost for environmental liabilities?
> A. No, there is not.
> Q. Is there a specific line item that subtracts out costs for other civil liabilities such as antitrust liabilities?

---

water processing facilities would also be an operating asset. See Mr. Felker's January 28, 2008 Deposition at pages 5-9, (rough transcript) for his discussion of the utilization of water processing at Graniteville.

[33] Mr. Taylor refers to his study as reviewing both other assets and liabilities. As a practical matter, virtually all of his analysis is based on a review of Avondale liabilities.

[34] See Taylor Workpapers Tab 28, Bates AM-TCG-RJT028887 and Taylor Workpapers Tab 16 Bates AM-TCG-RJT028857.

[35] See Mr. Taylor's January 11, 2008 Deposition at pages 556 – 560.

11

> A. No, no specific line item, but litigation or ongoing legal and professional fees for the support of the business are in those numbers. There is not a specific line item for antitrust or anything like that."[36]

Like the environmental liabilities specifically referenced in the quote above, payment of the remaining pre-derailment long-term liability balances presented in Mr. Taylor's schedule do not appear to be contemplated or included as reductions to cash flow in his DCF computation.[37] Had payment of those $11.5 million in other pre-derailment long-term liabilities hypothetically been modeled into Mr. Taylor's DCF, the resulting value of Avondale would have been less than his computed value of $332 million. Assuming those liabilities were reasonably recorded on the company's balance sheet (and thus could be expected to become due at some future date), Mr. Taylor's failure to include payment of those liabilities as elements of his DCF indicates that he must be assuming one of two things in computing Avondale's enterprise value: (1) that the liability at issue here is not paid down but rather remains unchanged on Avondale's balance sheet;[38] or (2) that such liabilities are more akin (in his analysis) to other types of long term debt, such as bank debt, payment of which is appropriately excluded as an element of a fair market value DCF. Under either of these assumptions, because payment of such liabilities is not contemplated in his DCF, payment of those liabilities should correspondingly not serve as a reduction to liquidation proceeds which offset the lost business value. To do so would effectively saddle the defendant with obligations of the plaintiff wholly unrelated to the derailment.

Mr. Taylor's inclusion of those payments as an offset to liquidation proceeds is not, in and of itself, inappropriate. Had Mr. Taylor modeled payment of those obligations into his cash flow (which, as indicated above, he has not), offsetting the liquidation proceeds could have been appropriate. Mr. Taylor's error is in failing to apply a consistent treatment to those liabilities in determining the appropriate net damages amount. As a result of liquidation proceeds being incorrectly understated by Mr. Taylor's methodological and theoretical inconsistency, the Corrected Taylor Report overstates damages significantly.

        ii.      Post- Derailment Incremental Other Liabilities

In Mr. Taylor's Corrected Report Exhibits, he also includes as elements of claimed damages, expense accruals for long term liabilities accrued for in the post-derailment period, but apparently arising from circumstances present pre-derailment. These incremental accruals are apparently a component of Mr. Taylor's claimed post-derailment losses ($73.1 million from January 2005 to May 2006, and another $55.7 million from May 26, 2006 to August 31, 2007).[39]

---

[36] See Mr. Taylor's January 11, 2008 Deposition at page 559.

[37] See CDG's July 26 Report at p. 59, the DCF as adopted by Mr. Taylor.

[38] This is consistent with the forecasted balance sheet included in CDG's July 26 Report (at p. 68).

[39] See Corrected Taylor Exhibit 1.0 (at lines "A" and "H").

12

Unlike the pre-derailment liabilities discussed above, these expense accruals (which were later recorded as a liability on Avondale's balance sheet) had not been specifically recorded as of the date of the derailment. However, to the extent that any of these incremental actual or estimated future expenses relate to circumstances existing prior to the derailment, or are otherwise unrelated to the derailment itself, it is inappropriate to include these accruals as incremental offsets to the liquidation proceeds (as Mr. Taylor has), if those amounts are not also recognized in the DCF that forms the basis for lost business value. As discussed above, although Mr. Taylor claims that these types of expenses / accruals are accounted for in his DCF, he is unable to identify where they are captured, either actually or theoretically. Given the magnitude of certain of the amounts discussed below, it seems probable that these amounts are not, in fact, captured in his DCF. Therefore, Mr. Taylor's net damages are again overstated. I discuss three specific expenses / accruals below.

In the post-liquidation period, and specifically as of August 31, 2007, Avondale recognized an expense accrual of $9 million, which was recorded on Avondale's balance sheet as an accrued environmental liability. This increase to Avondale's existing contingent environmental liability accrual of $3 million[40] was the result of Mr. Altherr's recent determination that he needed to increase Avondale's contingent environmental liability accrual by $9 million[41] for potential additional environmental risk exposure of Avondale (this amount was untested by Mr. Taylor – other than through discussion with Mr. Altherr).[42] I have seen no indication that an environmental expense of this magnitude was included in Mr. Taylor's DCF. Not only is the amount merely an estimate, it was booked at the "eleventh hour" in connection with the preparation of Avondale's "final" August 31, 2007 balance sheet. To the extent that this amount is unrelated to the derailment and is not considered in Mr. Taylor's DCF, it represents an inappropriate offset to liquidation proceeds and thus an overstatement of damages.

In addition, it appears that the initial $3 million of expense accruals for contingent environmental liabilities might also fall into this category, as might a $2 million accrual for litigation expenses unrelated to the derailment.[43]

---

[40] $2.125 million can be seen in Avondale's Consolidated Financial Statements (unaudited) as of August 25, 2006. An additional $875,000 was added on 8/31/07 and a final $9 million was added as another adjustment on 8/31/07. See Altherr Deposition Exhibit 80 at p. 1. These additional accruals approximate $12 million.

[41] See Deposition Exhibit 80 of Altherr.

[42] See Deposition of Taylor at pages 626-627. The discussion on these pages focuses on a value of $12.875 million of environmental accrual that was present on draft workpapers of Mr. Taylor in July 2007. This workpaper was not provided in the same form in Mr. Taylor's Corrected Report. Its counterpart, Taylor workpaper Tab 28 does not separately identify the environmental liability however, it can be reasonably inferred that the approximate $12 million liability is included in the losses for the period 2/07 – 8/07.

[43] See Altherr Deposition Exhibit 80 p. 1 (indicating $12 million in total post-derailment environmental reserves and $2 million in post-derailment non-derailment related litigation reserves.) I have discussed

13

As indicated above, any other long-term liabilities recognized after, but unrelated to the derailment,[44] should not be deducted from Avondale's liquidation proceeds without consideration of a commensurate reduction of Avondale's fair market enterprise value.[45] The fact that such long-term liabilities may be characterized by Avondale as contingent liabilities is largely irrelevant. Even contingent liabilities represent important valuation considerations that cannot be overlooked when determining fair market value – a concept that is supported by authoritative sources.[46]

### III. SUMMARY OF CONCLUSIONS

On the basis of the foregoing, it is my opinion that the Corrected Taylor Report continues to suffer from the criticisms outlined in both my January and Surrebuttal Reports as well as additional methodological criticisms discussed herein. As such, Mr. Taylor's Corrected Report presents unreasonable and unreliable damage conclusions and should be disregarded.

_____
Craig T. Elson

---

herein amounts associated with specific categories of contingent liabilities. Other categories of other long-term liabilities might also represent inappropriate reductions by Mr. Taylor to Avondale's liquidation value.

[44] See the deposition of Mr. Altherr (December 14, 2007) at pages 141-152. When expressly asked about the approximately $12 million environmental liability or the $2 million non-derailment litigation liability, Mr. Altherr's testimony does not indicate that this liability was caused by the derailment. To the extent that the plaintiff is able to provide evidence to the contrary, I will reconsider this issue.

[45] Alternatively, they should not be deducted from either.

[46] Pratt, Shannon P., Reilly, Robert F, Schweis, Robert P. *Valuing a Business, the Analysis and Appraisal of Closely Held Companies* (2000) at p. 61; Hitchner, James R., *Financial Valuation, Application and Models* (2003) at p. 661. Importantly, Avondale's new estimate of environmental liability is still just that – an estimate. Avondale's ultimate liability might differ substantially from what has been accrued.

# ATTACHMENT A

## Summary of Craig Elson's Deposition and Trial Testimony

1. David W. Allard, Trustee v. Commerica Bank f/k/a/ Manufacturer's National Bank of Detroit, NBD Bank f/k/a NBD Bank, N.A., Lirio Angelosante, Jeffrey D. Palmer, Kelvin J. Pennington, and Fletcher E. Allen (In Re: T.A.S. Graphic Communications, Inc. Debtor)
2. Louis Pauly v. Richard O'Heir, et al.
3. Econolodges of America, Inc. v. Worthen Bank, N.A.
4. Landis & Gyr v. Powers, U.K.
5. Wieboldts Department Stores, Inc. v. Jerome Schottenstein, et al. (In Re: Wieboldts Department Stores, Inc.)
6. Washington Industries, Inc. v. Citibank, N.A., et al.
7. Washington Industries, Inc. v. 224 Foundation, et al.
8. Central States Health & Welfare Fund, et al. v. Sherwin Williams Corporation
9. Carter Controls, Inc. v. ATR Coil Inc.
10. Whirlpool Financial Corp. v. Mercantile Bank, N.A.
11. In Re: IRE Services, Inc., et al. Debtors
12. Pay 'N Pak Stores, Inc. v. Citibank, N.A., et al.
13. Pay 'N Pak Stores, Inc. v. Monarch Mirror, et al.
14. Kenneco v. National Bank of Palatine, et al. (In Re: Kenneco, Inc., Debtor)
15. In Re: Sharon Steel Corporation, Debtor
16. Class of Security Holders v. Eagle Hardware and Garden
17. In Re: Kasson Cheese, Inc.
18. Food Barn Stores, Inc. v. Safeway Stores, Inc. (In Re: Food Barn Stores, Inc., Debtor)
19. Rollins Investment Fund v. Valentine & Pace, et al.
20. Telesphere Communications, Inc., et al. v. Ronald J. Haan, et al.
21. Richard M. Fogel, Trustee for the Estate of Madison Management Group, Inc. v. Samuel Zell, The Estate of Robert Lurie, Great American Management and Investment, Inc., and Great American Financial Group, Inc.
22. In the Matter of the Protest of Central California International v. Navistar International Transportation Corp.
23. TheraTx, Inc. v. James W. Duncan, Jr. et al.
24. Childrens Broadcasting Corporation v. The Walt Disney Company a/k/a Disney Networks, Inc. and ABC Radio Networks, Inc.
25. JMP Newcor, Inc. v. James C. Mills
26. Galileo International LLC v. United Airlines
27. LID Associates v. Charles F. Dolan and Cablevision SystemsServices Corporation
28. Lifecor, Inc. v. Cadent Medical Corp., et al.
29. Metamor Worldwide and NDC Group, Inc. v. P. Noce, et al.
30. Roadmaster Corp. v. General Electric Company
31. United Airlines v. Mesa Airlines, Inc. and Westair Commute Airlines, Inc.
32. Pamela J. Alper and Michael N. Alper v. Altheimer & Gray, Myron Lieberman and Robert L. Schlossberg
33. Skeena Cellulose, Inc. v. Consolidated Papers, Inc.
34. Linkco, Inc. v. Fujitsu, Ltd.
35. Bandag, Inc. v. Michelin Retread Technologies, Inc. and Michelin North America, Inc.
36. Richard A. Lippe, et al. v. Bairnco Corporation, et al.
37. J. Bronner & R. Gilhooly (SOS) v. SFX Sports Group, Inc. and SFX Entertainment, Inc.
38. EMC Group, Inc. v. Ryerson Tull, Inc. f/k/a Inland Steel Industries, Inc.
39. Telesphere Liquidating Trust v. Francesco Galesi
40. Dr. Ben S. Branch, as Trustee of Bank of New England Corporation v. Ernst & Young U.S., et al.

# ATTACHMENT A

41. Zenith Electronics Corporation v. WHTV Broadcasting Corporation
42. Electrical Design and Control Company v. Eric Monson, et al.
43. Interway Produtos Alimenticios, et al. v. Doctors Associates, Inc. Subway Partners, C.V., et al.
44. Klesch & Company Limited v. Liberty Media Corporation, John C. Malone and Robert R. Bennett
45. Gerald K. Smith, as Plan Trustee for and on Behalf of the Estates of Boston Chicken, Inc., et al. v. Arthur Andersen LLP, et al.
46. Aircraft Gear Corporation v. Clayton Marsh and Ropes & Gray, a partnership
47. VSI Holdings, Inc., et al. v. SPX Corporation
48. Final Analysis Communication Services, Inc. v. General Dynamics Corp., et al.
49. US Unwired, Inc., et al. v. Sprint Corporation, et al.
50. Patrick D. Cavanaugh, as the Estate Representative of the Chapter 11 Estate of Linc Capital, Inc. v. LFC Capital, Inc., formerly known as LINC Finance Corporation, and LFC Holdings, Inc.
51. RRK Holding Company v. Sears, Roebuck and Company
52. Golden West Refining Corporation Ltd. v. PricewaterhouseCoopers, LLP and Coopers & Lybrand LLP
53. CenTra, Inc. and Detroit International Bridge Company and Central States, Southeast and Southwest Areas Pension Fund
54. Clover Technologies, Inc., Debtor, Stuart A. Gold, Trustee, Plaintiff v. Ameritech CT Acquisition Corporation and SBC Communications, Inc.
55. Vought Aircraft Industries, Inc. v. Gulfstream Aerospace Corporation
56. Caterpillar, Inc. v. Navistar International Transportation Corporation, International Truck & Engine Corporation, Newstream Enterprises, LLC, Sturman Industries, Inc. and Sturman Engine Systems, LLC
57. NZMP (USA), Inc., Grace Brothers,LTD., United Equities Commodities Company, Elliott International L.P. and Martin Bauer, Inc., solely in their capacities as Trustees of the Global Health Sciences Creditor Trust v. Richard D. Marconi, Fred E. Siegel, Ed Alosio, David Katzen, Blossom Siegel, Patrick Marrinan, Trustee of the PM Irrevocable Trust, Elaine Berke, Paul Buxbaum, BGA Consulting, and Does 1-250
58. Alan B. Goer and Albert Randall Goer v. Jay L. Austrian and Jasco Industries, Inc.
59. Bridgestone/Firestone Cases I & II, including the following actions: Tompkins v. Ford Motor Co., Katz v. Ford Motor Co., Gray v. Ford Motor Co., and Montoya v. Ford Motor Co.
60. Bridgeport Holdings Inc., et al., Debtor, Bridgeport Holdings Inc. Liquidating Trust, v. CDW Corporation and CDW SAC, Inc.
61. Public Joint Stock Company Nizhnedneprovsky Pipe Rolling Plant and KLW-Wheelco S.A. v. Holden International, Inc. and IEC Holden, Inc.
62. GlaxoSmithKline Consumer Healthcare, L.P. v. Merix Pharmaceutical Corp.
63. Phar-Mor, Inc. v. McKesson Corporation
64. Adelphia Communications Corporation v. Deloitte & Touche, LLP v. John Rigas, Timothy Rigas, Michael Rigas, and James Rigas
65. Contemporary Industries Corporation, Debtor, Contemporary Industries Corporation v. Terry G. Frost, et. al.
66. CIBC World Markets v. AOM/Air Liberté
67. Avondale Mills, Inc. v. Norfolk Southern Corporation, et. al.
68. Converdyn v. James Neal Blue, Heathgate Resources Pty., Ltd., General Atomic Technologies Corporation, and Nuclear Fuels Corporation

# ATTACHMENT A

69. Morton P. Levin, as Chapter 11 Trustee for the Estate of Flooring America, Inc. v. <u>SunTrust Robinson-Humphrey</u>, et. al.

## ATTACHMENT B

| The following documents have been reviewed and considered by LECG, LLC as of February 1, 2008 in connection with this matter. |
|---|
| • Corrected Report of Robert Taylor dated December 7, 2007 |
| • January 22, 2007 Report of Craig Elson |
| • June 11, 2007 Surrebuttal Report of Craig Elson |
| • January 11, 2008 Deposition Transcript and Related Exhibits of Robert Taylor |
| • January 28, 2008 (Rough) Deposition Transcript of Stephen Felker |
| • December 14, 2007 Deposition Transcript of Jack Altherr |
| • July 3, 2007 Deposition Transcript and Related Exhibits of Craig Elson |
| • Source Documents for Damage Calculations in Corrected [Taylor] Rebuttal Report Dated December 7, 2007 (Inclusive of Internally Produced Documents from Jack Altherr). AM-TCG-RJT028802-970. |
| • All documents listed on Attachment C to the Report of Craig T. Elson dated January 22, 2007 (incorporated herein by reference) |
| • All documents listed on Attachment C to the Surrebuttal Report of Craig T. Elson dated June 11, 2007 (incorporated herein by reference) |